UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                                    Plaintiff,<br><br>       v.<br><br>CARLOS RIVERA,<br><br>                                    Defendant. | Case No. 3:16-cr-00083-MMD-WGC<br><br>ORDER<br>re Motion to Suppress<br>(ECF No. 16) |

I.    **SUMMARY**

Defendant Carlos Rivera ("Rivera") was arrested and charged with one count of being a felon in possession of a firearm. Before the Court is Rivera's Motion to Suppress ("Motion"). (ECF No. 16.) The Government filed a response (ECF No. 18) to which Rivera replied (ECF No. 21). The Court held an evidentiary hearing on February 6, 2017 ("Hearing"). (ECF No. 36.) At the Hearing, the Court heard testimony from Officer James Ahdunko and Officer Nathan Janning.[1] (*Id.*) For the reasons discussed herein, the Motion is granted.

II.    **RELEVANT FACTUAL BACKGROUND**

The following facts are taken from the exhibits attached to the parties' briefs and the testimony at the Hearing. On November 3, 2016, Elizabeth Axtell ("Axtell") was visiting her brother, who was staying in room #5 at the Campion Motel ("Motel") in Sparks, when

---

[1]The Court finds the testimony of both officers credible.

she heard commotion in the room next door. She walked over to room #4 and knocked on the door. A white woman with curly blond hair, later identified as Shantera Frenna ("Frenna"), refused to open the door and instead tapped a handgun against the window of the room. Axtell returned to her brother's room and called 911. She told the operator that she did not know who the woman was, but she suspected that the woman suffered from mental health problems. She also told the operator that she believed the room belonged to a man named Mark, but she did not know where he was.

Sparks police officers were deployed to the Motel. Officer Janning was the first to arrive. (ECF No. 21-1 at 4.) He approached the Motel on foot with his weapon drawn and noticed a man and a woman walking across the hotel's parking lot. (*Id.*) Officer Janning believed the woman matched the description of the woman with the gun, and also noticed that she was spinning and waiving her arms, which he believed may have been indicative of the mental illness mentioned in the 911 call. (*Id.*) The man and woman, later identified as Jamie Tanberg ("Tanberg") and Marcelino Gomez ("Gomez"), began to enter a car that had just pulled up. Officer Janning approached the car and ordered Tanberg and Gomez to the ground. After several other officers arrived, they detained and searched Tanberg and Gomez. The officers found a realistic looking pellet gun on Gomez. Officer Janning believed that the pellet gun was gun referred to in the 911 call. (*Id.*)

Officer Ahdunko arrived at the Motel and helped Officer Janning and others detain Tanberg and Gomez. (ECF No. 18-3 at 2.) While Officer Janning questioned the detained suspects, Officer Ahdunko went to speak with the 911 caller, Axtell. (*Id.*) As he walked past room #4, Officer Ahdunko noticed clothing and other items had been thrown out on the sidewalk and parking lot in front of the room and also noticed that the room was still occupied.[2] (*Id.*) Before going to room #5 to speak with Axtell, he and another officer knocked on the door of room #4. Frenna answered the door. Officer Ahdunko could see

---

[2]Officer Ahdunko had also noticed items that appeared to have been discarded out of the back window of room #4, which faces an alley, when he first arrived at the Motel. (ECF No. 36 at 32-33.)

that behind her the small room was in disarray and a man was sleeping on the bed. He also noticed a large imprint in the drywall. (*Id.*) Frenna stepped out of the room to talk to the officers. (ECF No. 36 at 33.)

Officer Ahdunko recognized Frenna because just four days earlier, on October 30, he responded to a complaint that she was trespassing in room #4 and helped remove her from the premises. (ECF No. 36 at 10-11.) During the October 30th incident, Ahdunko learned that the lessee of room #4 was a man named Mark Atkins. He also learned that, though the Motel does not have a manager's office, a woman named Nancy Hedges ("Hedges"), who lived at the Motel, served as the de facto on-site manager.[3] Hedges signed the October 30th trespassing complaint.

On November 3, after Frenna exited the room, Officer Ahdunko did not notice any obvious signs of injury on her or the man on the bed. (ECF No. 36 at 35.) He asked Frenna if she was okay, and she replied that she was. (ECF No. 18-3 at 2.) Frenna was cooperative and was relatively calm. Her hands were exposed and not hidden in her pockets. She told the officers that she wanted their help because she believed a child was trapped in the walls of the room. (*Id.*) Because of his earlier contact with her, Officer Ahdunko knew that Frenna exhibited signs of mental illness and was easily agitated. He did not detain or pat her down because he believed it would upset her and make the situation more difficult. (ECF No. 36 at 15-16.) Officer Ahdunko estimated that his initial exchange with Frenna took about 2 or 3 minutes. (ECF No. 36 at 33.)

After making contact with Frenna, Officer Ahdunko went to room #5 and spoke with Axtell about what she had seen and heard. (ECF No. 18-3 at 2.) Officer Ahdunko estimated that his conversation with Axtell lasted about 3 minutes. (ECF No. 36 at 36.) Adunko continued to investigate by returning to the parking lot to speak with Tanberg. He asked Tanberg if she had been in room #4 that evening. Tanberg responded that she had

[3]Officer Ahdunko later learned that Hedges did not have any actual authority to act as an on-site manager. However, during the events of November 3 he was still under that impression. (ECF No. 36 at 57-59.)

3

not, and she was visiting friends in room #10. (*Id.*) Officer Ahdunko then returned to Axtell and asked if Frenna, who was still standing outside of room #4, was the women she had seen in the window. Axtell said Frenna may have been the woman, but she was not 100% certain. (ECF No. 36 at 15.)

After speaking to Axtell, Ahdunko determined that there was not probable cause to arrest Frenna for the crime of brandishing a weapon based on the behavior Axtell reported. (ECF No. 36 at 23-24.) This conclusion was based in part on Axtell informing Officer Ahdunko that the weapon was never actually aimed at her. (*Id.* at 63-64.) Nevertheless, Officer Ahdunko asked Frenna if the officers could enter room #4. Frenna responded "yes." He then asked her where the gun was, and she said it was somewhere in the room, possibly near the bathroom. (ECF No. 18-3 at 2-3.)

Officers Ahdunko and Beruman entered room #4. After looking around the room, they attempted to wake the man on the bed. He was unresponsive. (ECF No. 18-3 at 3.) Officer Beruman attempted to flip the man over, and as he did the officers noticed a black handgun underneath the pillow. (*Id.*) Officer Ahdunko grabbed the gun while other officers placed the man in handcuffs. The officers identified the man as the defendant, Carlos Rivera. They performed a criminal history check and determined that he was an ex-felon. The officers took Rivera into custody. (*Id.*)

 Rivera was indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (ECF No. 1.)

## III. DISCUSSION

Rivera argues that the handgun recovered during the search must be suppressed because the officers did not have authority to enter the room, and even if they did, they did not have authority to search the bed in which he was sleeping. In response, the Government argues that the officers properly relied on Frenna's apparent authority to consent to a search, and that entry into the room was additionally supported by exigent circumstances — namely to ensure the officers' safety.

///

4

1    The Fourth Amendment provides that the "right of the people to be secure in their
2    persons, houses, papers, and effects, against unreasonable searches and seizures, shall
3    not be violated." U.S. Const. amend. IV. The Ninth Circuit has stated that it is "a basic
4    principle of Fourth Amendment law that searches and seizures inside a home without a
5    warrant are presumptively unreasonable." *LaLonde v. Cnty. of Riverside*, 204 F.3d 947,
6    954 (9th Cir.2000) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)) (internal
7    quotation marks omitted). Evidence recovered through an unlawful entry into a home is
8    not admissible and must be suppressed. *United States v. Arreguin*, 735 F.3d 1168, 1174
9    (9th Cir. 2013).

10    **A.    Consent to enter the room**

11    The parties do not dispute that Frenna gave the officers permission to enter room
12    #4. What is in dispute is whether Frenna had the legal authority to give that permission,
13    or whether a reasonable officer would have believed that she had such authority given
14    what they knew at the time.

15    **1.    Actual Authority**

16    "Although consent is a recognized exception to the Fourth Amendment's
17    protection, the government has the burden of establishing the effectiveness of a third
18    party's consent to a search of a defendant's property." *United States v. Arreguin*, 735 F.3d
19    1168, 1174–75 (9th Cir. 2013) (internal citations and quotation marks omitted). In order
20    to meet its burden, the government must demonstrate a third party had "shared use and
21    joint access to or control over a searched area" or "the owner of the property to be
22    searched has expressly authorized a third party to give consent to the search." *Id.* (quoting
23    *United States v. Welch*, 4 F.3d 761, 764 (9th Cir. 1993)). "The existence of consent to a
24    search is not lightly to be inferred." *United States v. Reid*, 226 F.3d 1020, 1025 (9th Cir.
25    2000). The Ninth Circuit has held that the "mere fact of" a third party's access to an area,
26    "without more, does not indicate that the access was authorized" and that the third party
27    had authority to consent to a search of the area. *Id.* (quoting *United States v. Dearing*, 9
28    F.3d 1428, 1430 (9th Cir. 1993)).

The government has not offered any evidence that Frenna had actual authority to consent to a search. According to the notes of a pair of Alcohol, Tobacco, Firearms and Explosives ("ATF") agents, Mark Atkins occasionally allowed Frenna, who was homeless, into his room when the temperature outside became dangerously cold. (ECF No. 18-2 at 2.) This is not enough to support a finding that she had shared access and control over the room or that Atkins authorized her to consent to a search. Therefore, the Court finds that Frenna did not have actual authority to consent to the search.

### 2.    Apparent Authority

Even if the government cannot show that a third-party had actual authority to consent to a search, the fruits of a search may still be admissible if the officers *reasonably believed* that the person who consented had authority. This concept, called the apparent authority doctrine, provides that "a search is valid if the government proves that the officers who conducted it reasonably believed that the person from whom they obtained consent had the actual authority to grant that consent." *Arreguin*, 735 F.3d at 1175 (quoting *Welch*, 4 F.3d at 764). The district court must determine whether the officer's judgment was objectively reasonable given "the facts available to the officer at the moment." *Illinois v. Rodriguez*, 497 U.S. 177, 188, (1990). If it is unclear whether a third-party has authority, an officer should take steps to investigate before relying on that person's consent. *See United States v. Kimoana*, 383 F.3d 1215, 1222 (10th Cir. 2004) ("[W]here an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent.").

Here, Officer Ahdunko was familiar with the Campion Hotel and recognized Frenna because four days earlier he removed her from the very room at issue for trespassing. At the Hearing, Officer Ahdunko testified even if people have been removed from rooms for trespassing, it was common for residents to change their minds and allow that person to reenter their rooms at a later date. (ECF No. 36 at 11.) Therefore, he did not believe Frenna's October 30th trespassing incident had any particular bearing on her ability to consent to a search on November 3. (*Id.*) Accepting all of this as true, and the Court has

no reason to question Officer Ahdunko's credibility, these facts only speak to Frenna's ability to be a guest in room #4, not her ability to consent to a search. In other words, Officer Ahdunko may be reasonable in assuming, based on his experience, that Frenna's presence in room #4 after her removal days before at best meant that she had permission to be in room #4 as an invited guest, but he cannot reasonably assume that she had authority to consent to an entry and search of the room. To the contrary, the facts available to Officer Ahdunko at the time of the search would suggest Frenna has no such authority. Officer Ahdunko knew that the room belonged to Mark Atkins, and he knew that four days earlier Atkins had the power to exclude Frenna from the room. Given this, he did not perform any additional investigation before relying on her consent. He did not, for example, ask any neighbors about Frenna's status, nor did he ask Nancy Hedges, who he believed at the time was some sort of on-site manager, about Frenna. He also did not ask Frenna any follow up questions about her presence in the room or the status of the man sleeping on bed. Given Ahdunko's knowledge that Frenna was removed from the room just days earlier, and given a complete lack of any other factors that may have indicated she had authority to consent to a search, the Court cannot find that Officer Ahdunko has an objectively reasonable basis to believe that Frenna was in a position to permit officers to enter and search room #4. For these reasons, the Court finds that entry into the room was not justified by the apparent authority doctrine.

## B. Exigent Circumstances

The government argues that separate and apart from Frenna's consent, the officers were justified in entering the room due to exigent circumstances. Exigent circumstances are a limited exception for the general requirement of a warrant. The Ninth Circuit has described exigent circumstances as "those that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. Furrow*, 229 F.3d 805, 812 (9th Cir.2000) (internal quotations omitted), overruled

on other grounds by *United States v. Johnson*, 256 F.3d 895 (9th Cir.2001). The government bears the burden of demonstrating that exigent circumstances justified a warrantless search, and that burden is "heavy." *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984). The government can meet their heavy burden only by showing "specific and articulable facts" that justify a finding of exigent circumstances. *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 957 (9th Cir.2000) (quoting *United States v. Shephard*, 21 F.3d 933, 938 (9th Cir.1994)). It must offer more than mere speculation. *See United States v. Suarez*, 902 F.2d 1466, 1468 (9th Cir.1990). Furthermore, "[t]he presence of a firearm alone is not an exigent circumstance." *United States v. Gooch*, 6 F.3d 673, 680 (9th Cir. 1993)

The government argues that the officers were justified in entering the room in order to prevent harm to themselves or others based on the information available to them at the time — a guest in the adjoining room had complained, there was an unaccounted for gun in the room, and they were aware of the man sleeping on the bed who had a hand hidden under a pillow.

As an initial matter, neither Officer Ahdunko nor Officer Berumen's reports indicate that they entered the room because they were concerned about their safety. Both reports describe entering the room only after receiving permission from Frenna. (ECF No. 18-3 at 2; ECF No. 18-4 at 2.) This is consistent with Officer Ahdunko's testimony at the Hearing. On cross examination, Officer Ahdunko acknowledged that if he believed an emergency had occurred, he likely would have included that in his report. (ECF No. 36 at 42.)

Before they entered the room, Officer Ahdunko testified that Frenna was cooperative and her hands were visible to the officers. (ECF No. 36 at 15.) She had voluntarily opened the door and exited the room. (*Id.* at 34.) Frenna left the door open behind her and the officers could see into the room. (*Id.* at 10.) They could see the man on the bed through the open door. (*Id.*) And Officer Ahdunko had already determined that Frenna did not commit the offense of brandishing a firearm. (*Id.* at 23-2.) Officer

8

Ahdunko's testimony and the officers' reports show that at the time the officers entered room #4 they were in the middle of a careful investigation, rather than any emergency situation.

The government argues that the sleeping man may have awoken (or risen from his feigned sleep) at any time and presented a threat to the officers, however the government has not shown any "specific and articulable" reasons to believe the man would present a threat. In fact, the government's argument seems to assume a per se rule that the possible existence of a gun and an unknown person asleep in the same apartment constitutes exigent circumstances. The Court can find no such authority establishing such a rule, nor does it think such a rule would be wise. Such a rule would run contrary to the admonishment that "[t]he presence of a firearm alone is not an exigent circumstance." *Gooch*, 6 F.3d at 680.

The 911 call identified a woman — Frenna — who was behaving erratically with a gun. The officers had the subject of the 911 call, who they had previously encountered in the same room, under control, verified that neither she nor the sleeping man had any obvious injury, and further had at least initially determined that she had not committed any crime. The entry into room #4, therefore, was further investigation for the existence and location of the reported firearm that required either consent (which the officers mistakenly believed they had) or a search warrant. Given these facts, the government has not met its "heavy" burden of demonstrating exigent circumstances.

For these reasons, the Court finds that the Government's exigency argument is a post hoc justification that is not supported by the officers' reports or testimony.

## IV.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion.

///

1    It is therefore ordered that Defendant's Motion to Suppress (ECF No. 16) is

2 granted.

3

4    DATED THIS 10th day of February 2017.

5                                                    _____

6                                                    MIRANDA M. DU
                                                     UNITED STATES DISTRICT JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28